# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1594

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Northern |
| | * | District of Iowa. |
| Darrin Todd Haack, | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted:  November 16, 2004
Filed:  April 13, 2005

_____

Before MURPHY, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Mr. Haack provided substantial assistance following his arrest on drug conspiracy and gun charges.  Mr. Haack pled guilty, and the government moved for a downward departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), recommending a ten percent departure on the conspiracy charge.  The district court granted a much greater departure.  The government appeals the sole issue of whether the district court abused its discretion by departing to an unreasonable extent.  We reverse and remand for resentencing.

I.

Mr. Haack participated in a multi-state marijuana trafficking conspiracy. It is undisputed that, at a minimum, he allowed other members of the conspiracy to deliver, package, and redistribute large quantities of marijuana to and from his rural residence near Waseca, Minnesota. Mr. Haack received cash as well as distribution quantities of marijuana as payment. He distributed the marijuana that he received.

Officers learned of Mr. Haack's involvement in part from their investigation of two Iowans, Tom and Jeannette Clayton. The Claytons told officers that they received their marijuana from Mr. Haack. Tom Clayton also told officers that he received a 9 millimeter handgun from Mr. Haack while picking up marijuana at Mr. Haack's residence. Officers used this information to obtain a search warrant for Mr. Haack's residence. During the search, officers discovered Mr. Haack at home with his children. Officers also discovered over forty pounds of marijuana and a .357 caliber handgun. On the night of his arrest, Mr. Haack provided a self-incriminating post-Miranda statement. In his statement, he named two coconspirators, Holly and Cesar Perez.

That night, local authorities held Mr. Haack at the Waseca County Jail in Minnesota. The following morning, federal officers took custody of Mr. Haack and drove him approximately 300 miles to Sioux City, Iowa, where his initial appearance took place before a United States Magistrate Judge. The government charged him in a two count indictment for conspiring to distribute 1000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A), and knowingly using and carrying a firearm during and in relation to the drug offense in violation of 18 U.S.C. § 924(c).

According to Mr. Haack, an Assistant United States Attorney for the Northern District of Iowa told him and his counsel that no cooperation offer would be made at

any time if he failed to cooperate immediately or demanded a detention hearing. Nevertheless, Mr. Haack requested a detention hearing. The district court denied his request. On April 14, 2003, Mr. Haack filed a Motion to Dismiss and a Motion to Suppress. On August 7, the district court denied Mr. Haack's motions.

In September, the government changed its position and offered Mr. Haack the opportunity to cooperate and provide assistance. Mr. Haack pled guilty to both counts and provided assistance in the form of information. Mr. Haack did not participate in any controlled buys on behalf of the government, work undercover, or otherwise place himself in a position of danger (other than the danger inherent in providing information to the government). Further, other than the information that he provided regarding the Perezes on the night of his arrest (which preceded any cooperation agreement), the only information he provided was information regarding parties already under investigation by the government. Mr. Haack was willing to testify against the Perezes.

At the sentencing hearing, the government moved for a downward departure on the drug count based on Mr. Haack's cooperation and substantial assistance under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). The government recommended a ten percent departure. The government did not move for a departure on the gun count.

At the sentencing hearing, the district court explored the nature and extent of Mr. Haack's assistance to the government and the effect that this assistance had on the government's ability to investigate and prosecute other defendants or obtain pleas. In addition, the district court explored the issue of timeliness and whether the government penalized Mr. Haack for his initial assertion of rights through the request for a detention hearing and the motions to suppress and dismiss. The district court also addressed the issue of the truthfulness and completeness of Mr. Haack's statements. We address in detail the exchanges that took place during the sentencing hearing.

The government explained that the initial statement Mr. Haack made on the night of his arrest implicated coconspirators Holly and Cesar Perez. This information, together with phone tolls and scraps of paper that officers found in Mr. Haack's home, supported a search warrant for the Perezes' home. Although the government conceded that Mr. Haack's initial statement led to the investigation of the Perezes and helped officers obtain a search warrant for the Perezes' home, the government noted that Mr. Haack's early refusal to cooperate forced officers to gather additional evidence and deprived officers of the benefit of Mr. Haack's testimony for use in grand jury proceedings.

The government further explained that the Perezes started cooperating immediately and provided information about Mr. Haack and other conspirators. The Perezes, however, later withdrew their cooperation. When Mr. Haack agreed to cooperate in September, he gave some information regarding co-defendants Luis Caballero and Jose Martinez and gave more detail regarding the Claytons. Mr. Martinez also cooperated with the government. The government characterized Mr. Haack's assistance as being most helpful in obtaining guilty pleas from Holly and Cesar Perez. Mr. Haack was willing to testify against the Perezes, and the government believed that this willingness to testify, along with testimony from Mr. Martinez and scraps of paper from Mr. Haack's house, comprised the case against the Perezes that induced their guilty pleas.

The district court asked the government what effect Mr. Haack's decision to assert his right to request a detention hearing and move for suppression had on the timeliness and effectiveness of his assistance. The government explained that, because Mr. Haack's cooperation was delayed, the Perezes offered certain information that Mr. Haack could have provided, thereby decreasing the value of Mr. Haack's eventual cooperation. In addition, the government noted that Mr. Haack's election to seek a detention hearing and his decision to move for suppression or dismissal forced the government to develop evidence by other means. The

government argued generally that Mr. Haack was less worthy of leniency than defendants who "come clean" immediately, forego their rights, and provide assistance early in an investigation. The district court stated:

> [I]t does have an effect on timeliness, but I'm not going to use it in my mind because I think it kind of penalizes the defendant for exercising their right to challenge evidence, and every defendant has a right to do it. . . . It doesn't make him quite as timely as somebody who jumps on board, but that's just one of five factors.

Mr. Haack's attorney characterized the lack of timeliness as due to the government's policy of denying any opportunity for cooperation following a defendant's initial attempt to assert rights. According to Mr. Haack's attorney, the government changed its position and offered Mr. Haack the opportunity to cooperate only after conflicting stories from Tom Clayton and Jose Martinez created a need for corroborating testimony. In addition, he argued that when the government offered Mr. Haack the opportunity to cooperate, it needed a witness to testify against Luis Caballero and Cesar Perez.[1]

Regarding Mr. Haack's truthfulness and the completeness of his cooperation, the government stated that it had reservations as to whether Mr. Haack had told the "whole story" about the scope of the conspiracy around Waseca. The government noted that the full extent of the conspiracy was still not clear and that Mr. Haack provided information only about the conspiracy's core members, whom the government was already investigating.

---

[1]We have questions about a policy that requires a defendant to waive a detention hearing and forego other rights in order to cooperate. However, we understand that the United States Attorney for the Northern District of Iowa no longer requires a defendant to waive a detention hearing in order to enter into a cooperation agreement. Since the district court did not penalize the defendant based on a lack of timeliness, we do not address the issue of the propriety of such a policy.

The district court also questioned Mr. Haack's attorney about the gun count. The evidence suggested, and the government's theory on the gun count was, that Mr. Haack had placed a 9 millimeter handgun in a bag of marijuana and given it to Tom Clayton. It is undisputed that officers found a .357 handgun in Mr. Haack's residence on the night of the search. Regarding other activity with guns, the district court asked the government:

> [I]s there any evidence in the discovery file that this defendant carried a weapon in furtherance of his drug-trafficking activity other than what you've already told me about with regard to these two weapons [the 9 millimeter reported by Tom Clayton and the .357 found during the search]?

The government responded that there was no such evidence. The district court then stated:

> Okay. I'll tell you something. You know, I am no fan of the guidelines, but a 180-month sentence for somebody with a criminal history category 1 in a marijuana case, I'm not trying to say marijuana ought to be legalized or anything like that. I'm just saying, you know, I've given many outrageous sentences under these guidelines almost all in the drug area. He's not going to get a 180-month sentence because of substantial assistance, but just to think that you could for somebody in a criminal history category 1, you know, when are people going to wake up and do something about these ridiculous United States Sentencing Guidelines?
> . . .
> You know, Judge Bright, Myron Bright, on the Eighth Circuit dissents on a lot of these cases, and he always ends his dissents with, Is anybody listening? And I think the answer is not the right people who have the power to change these ridiculous laws. I know you can't take a position. It strikes me as ridiculous that somebody could get a 180-month sentence for this crime, these crimes. But you just enforce the law.

Following these comments, the government took issue with the district court's characterization of the case, noted that this was a large conspiracy that moved "tons of marijuana, not pounds," and noted that the location of the conspiracy and drug trafficking in small-town southern Minnesota made the conspiracy a large impact problem.

The court then asked if it would be likely that future assistance from Mr. Haack might lead to a later Rule 35(b) motion to amend the sentence. The government responded:

> Based on what the defendant has told us, I would say slim to none. I can tell you that a couple of the major players in the case have yet to be found, and I believe — this was pursuant to your earlier question. I believe that we don't have an idea of what was going on in Waseca. If the defendant could tell us those things, there's a potential, but based on what we know right now, I don't think there is one.

Next, the court explored the details of the drug quantity. Mr. Haack plead to 1000 kilograms or more of marijuana. The government noted the sentencing range was between 1000 and 3000 kilograms and that various witness testimony placed the quantity of marijuana for the entire conspiracy at about 6000 pounds (over 2700 kilograms). The government, however, took a conservative position and argued for an offense level commensurate in scope only with the lower, 1000 kilogram plea.

Finally, the court heard Mr Haack's apology and request for favorable treatment. Mr. Haack's attorney also made an appeal to the court for leniency, concluding, "But the price that he pays should be related to what he did." The following exchange ensued:

| The Court: | In whose eyes? |
| Counsel: | In your eyes. |

| The Court: | That's right, the sentencing commission isn't up here sentencing the defendant.  I am. |
| Counsel: | That's right. |
| The Court: | They didn't take an oath of office.  I did. |
| Counsel: | That's right. |

Mr. Haack's attorney argued that a 70% reduction on the conspiracy count, from 120 months to 30 months would be appropriate.  The district court noted that Mr. Haack was in criminal history category I, and for the conspiracy count his offense level was 29.  This would have made the guidelines range 87-108 months but for the 120-month mandatory minimum.  The gun count carried a mandatory, consecutive 60 months for a total mandatory minimum of 180 months.  The district court sentenced Mr. Haack to the mandatory minimum 60-month term for the gun count, and 18 months on the conspiracy count.  The 18-month sentence on the conspiracy count represented an 85% departure from the mandatory minimum of 120 months and a greater departure than even Mr. Haack requested.  The 18-month sentence on the drug count, coupled with the consecutive 60-month mandatory minimum sentence on the gun count, represented a departure of 57% from the total mandatory sentence of 180 months.

## II.

Prior to the United States Supreme Court decision United States v. Booker, 125 S. Ct. 738 (2005), a government appeal of a sentence that was less than the applicable guidelines range was governed by 18 U.S.C. § 3742(e).  One of the Booker remedial provisions excised 18 U.S.C. § 3742(e).  Booker, 125 S.Ct. at 756-57.  In its place, the Supreme Court held that it is the duty of the reviewing appellate court to determine if the sentence is unreasonable with regard to 18 U.S.C. § 3553(a).  Id. at 765.  Since the Booker decision, various appellate and district courts have begun to wrestle with the issue of how to apply the Booker remedial provisions and how appellate courts are to go about the business of deciding whether a sentence is

reasonable. In order to assist the appellate courts in discharging their responsibility of determining reasonableness, we encourage district courts to follow the procedure outlined by the Second Circuit in United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005), where the court stated:

> Thus, at this point, we can identify several essential aspects of *Booker/Fanfan* that concern the selection of sentences. First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide after considering the Guidelines and all the other factors set forth in section 3553(a), whether (I) to impose the sentence that would have been imposed under the Guidelines, *i.e.*, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Thus, the sentencing court must first determine the appropriate guidelines sentencing range, since that range does remain an important factor to be considered in the imposition of a sentence. We, like the Second Circuit, realize that there may be situations where sentencing factors may be so complex, or other § 3553(a) factors may so predominate, that the determination of a precise sentencing range may not be necessary or practical. However, in those cases the court should be careful to identify potential applicable ranges, the reason why a specific range is not being selected, and other § 3553(a) factors that predominate. Once the applicable range is determined, the court should then decide if a traditional departure is appropriate under Part K and/or § 4A1.3 of the Federal Sentencing Guidelines. Those considerations will

result in a "guidelines sentence." Once the guidelines sentence is determined, the court shall then consider all other factors set forth in § 3553(a) to determine whether to impose the sentence under the guidelines or a non-guidelines sentence.

In determining the appropriate guidelines sentencing range to be considered as a factor under § 3553(a), we see nothing in <u>Booker</u> that would require the court to determine the sentence in any manner other than the way the sentence would have been determined pre-<u>Booker</u>. Again, as the Second Circuit stated in <u>Crosby</u>, 397 F.3d at 112:

> The applicable Guidelines range is normally to be determined in the same manner as before *Booker/Fanfan*. Moreover, although the Court in the Substantive Opinion prohibits a sentencing judge from finding any facts that enhanced a Guidelines sentence above the range that is based solely on facts found by the jury in its verdict or admitted by the defendant, the Court in its Remedy Opinion contemplates that, with the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection. Thus, the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence.

Applying the principles just articulated to the sentence at hand, we first note that there is no dispute about the applicable sentencing guidelines range. As previously indicated, the defendant was facing a mandatory minimum 180-month sentence. There was also no question that the grounds for the departure were authorized under § 5K1.1, as well as 18 U.S.C. § 3553(e). Thus, the issue we face is whether the sentence imposed is a reasonable "guidelines sentence" and, if not,

-10-

whether there are other factors under § 3553(a) that would make the sentence reasonable.

In an accompanying case being filed today, United States v. Dalton, No. 04-1361, we hold that our standard of review is whether the district court abused its discretion by imposing an unreasonable sentence on the defendant. Our prior articulations of the abuse of discretion standard are wholly consistent with the concept of reasonableness as set forth in Booker. See, e.g., Aaron v. Target Corp., 357 F.3d 768, 774 (8th Cir. 2004) (discussing the abuse of discretion standard in the context of an abstention decision); Verizon Communications, Inc. v. Inverizon Int'l, Inc., 295 F.3d 870, 872-73 (8th Cir. 2002) (discussing the abuse of discretion standard in the context of a decision to stay a declaratory judgment action pending resolution of a related state court action); Williams v. Carter, 10 F.3d 563, 566 (8th Cir. 1993) (discussing the abuse of discretion standard in the context of a magistrate judge's decision not to appoint counsel and subpoena certain witnesses); Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984) (discussing the abuse of discretion standard in the context of a motion to dismiss without prejudice). In Kern, for example, we stated that when a decision is discretionary, "the court has a *range of choice*, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Id. (emphasis added). We also made it clear that the range of choice is limited. Id. ("when we say that a decision is discretionary . . . we do not mean that the district court may do whatever pleases it"). Similarly, reasonableness as a constraint on a district court's discretion to depart downward infers a limited range of choice.

In Kern, we noted that an abuse of discretion may occur when (1) a court fails to consider a relevant factor that should have received significant weight; (2) a court gives significant weight to an improper or irrelevant factor; or (3) a court considers only the appropriate factors but in weighing those factors commits a "clear error of judgment." Id. A discretionary sentencing ruling, similarly, may be unreasonable if

-11-

a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.

Applying this standard to the present case, we are left with the firm impression that the district court reached outside the permissible range of choice and abused its discretion by departing downward to an "unreasonable degree."

Section 3553(e), which allows for the imposition of sentences below the mandatory minimum, provides, "Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code." The relevant sentencing guidelines and accompanying policy statements are found in U.S.S.G. § 5K1.1, which provides as follows:

(a)   The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

(1)   the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)   the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)   the nature and extent of the defendant's assistance;

(4)   any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5)     the timeliness of the defendant's assistance.

Id.

The district court articulated no reasons other than the traditional 5K1.1 factors and its dissatisfaction with the then-mandatory nature of the Federal Sentencing Guidelines as justification for the sentence.   Accordingly, we examine the reasonableness of the guidelines sentence against those factors.

In assessing the five factors outlined in U.S.S.G. § 5K1.1, we concentrate most closely in this case on the first and third factors, that is, (1) the significance and usefulness of the assistance and (3) the nature and extent of the assistance.  As to the second factor, truthfulness and completeness, the government has some question about Mr. Haack's completeness.  However, for purposes of our analysis, we, like the district court, assume that Mr. Haack was truthful and complete.  As to the fourth factor, there is no evidence that Mr. Haack suffered any injury or that there was any significant danger or risk of injury as a result of his cooperation.  Finally, as previously noted, we, like the district court, assume that Mr. Haack complied with the fifth factor and his assistance was timely.

The government makes much of its argument that, in applying the first of the five factors above, the district court failed to take into consideration the government's evaluation of the assistance rendered.  See U.S.S.G. § 5K1.1(a)(1) ("taking into consideration the government's evaluation of the assistance rendered"); § 5K1.1 cmt. n.3 ("Substantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain.").  We reject this argument.  In our evaluation of the sentencing transcript, we do not believe the district court failed to take into consideration the government's recommendation.  Rather, the district court believed the government's recommendation did not fully compensate Mr. Haack for the

significance and usefulness of his assistance. Further, the government's recommendation is only a part of one of the five factors to be considered. It is ultimately the responsibility of the sentencing judge to determine the extent of the downward departure.[2]

We must conclude, however, that the significance and usefulness of the assistance and its nature and extent in this case were such that the departure was excessive. The mandatory minimum became the guideline for the conspiracy count, that is, 120 months, plus an additional 60-month consecutive sentence on the gun count. The court reduced the total sentence of 180 months to 78 months. Basically, the cooperation that earned Mr. Haack such a large departure was the information he gave to law enforcement at the time of his arrest which led to the issuance of a search warrant of the Perez residence and the availability of Mr. Haack to testify against the Perezes. In addition, after Haack agreed to cooperate, he provided limited information about Mr. Martinez and Mr. Caballero as well as information regarding the Claytons. By that time, however, Mr. Martinez and Mr. Caballero were already under indictment, and the Claytons, of course, were the suspects who led officers to Mr. Haack in the first place. Although we cannot say with mathematical precision how much of a departure should be granted for such cooperation, we conclude that the district court abused its discretion in departing 102 months off the total sentencing package of 180 months for such minimal cooperation. A departure of this extent leaves little room for greater departures for defendants who actually participate in

_____

[2]The panel deciding this case heard three appeals on the same day from the United States Attorney's office involving the same sentencing judge. It is obvious that the sentencing judge was frustrated by the government's identical recommendations of ten percent departures in each of these three dissimilar cases. We expressed similar concerns to the Assistant United States Attorney who argued the cases. We had difficulty discerning how three such dissimilar cases could all result in the identical recommendation for departure. A recommendation by the government that does not adequately explain its reasoning is entitled to less weight, in the court's view, than a more fully explained recommendation.

controlled buys, wear wires, give grand jury and trial testimony, or are subjected to significant risk of injury or death to themselves or their family.

We are also troubled by the district court's comments which seem to indicate that the departure was based, at least in part, on an improper or irrelevant factor, namely, the district court's dissatisfaction with the sentencing guidelines. One of the factors discussed in Kern that can show an abuse of discretion is the consideration of an improper factor. Kern, 738 F.2d at 970. We must conclude that in this case the court departed, at least in part, based upon the improper factor of its dissatisfaction with the then-mandatory sentencing guidelines, and not solely on the defendant's cooperation.[3]

Under the framework we previously articulated, we now turn to the issue of whether the sentence, as imposed, is a reasonable "non-guidelines sentence" applying the balance of the § 3553(a) factors. Based on the record before us, we can find nothing in § 3553(a) which would justify a total sentence of only 78 months. Having said that, however, we are cognizant of the fact that the court sentenced Mr. Haack prior to Booker and that neither the parties, nor the court, argued nor articulated non-guidelines § 3553(a) factors for sentencing. Accordingly, we vacate the sentence as

---

[3]We also believe the district court's comment concerning the Sentencing Commission was both unnecessary and inaccurate. At the time of sentencing, four of the seven members of the Sentencing Commission were Article III judges who had taken the same oath as the district judge in this case. In addition, the Commissioners themselves take a separate oath to faithfully discharge their responsibilities as members of the Sentencing Commission. Compare 28 U.S.C. § 453 (oath of office for judges, and therefore, judicial members of the sentencing commission) with 5 U.S.C. § 3331 (oath of office for individuals "elected or appointed to an office of honor of profit in the civil service or uniformed services.").

an unreasonable guidelines sentence, even allowing for the substantial assistance departure, and remand for resentencing under <u>Booker's</u> remedial procedure.

_____