# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3001

_____

United States of America,       *
                                   *

           Appellant,       *

                                   *   Appeal from the United States
    v.                         *   District Court for the
                                   *   Southern District of Iowa.

Brian Michael Gall,         *

                                   *

           Appellee.       *

_____

Submitted: February 14, 2006
Filed: May 12, 2006

_____

Before LOKEN, Chief Judge, BOWMAN and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Brian Michael Gall pleaded guilty to conspiracy to distribute a mixture and substance containing methylenedioxymethamphetamine ("MDMA"), a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846. The district court imposed a sentence of 36 months' probation and a $100 special assessment. The government appeals the sentence, arguing that it is unreasonable. We conclude that Gall's sentence is unreasonable. Accordingly, we remand the case for resentencing.

## I. *Background*

In February or March 2000, Gall entered into an agreement with Luke Rinderknect and others to distribute MDMA, also known as ecstacy. Initially, Gall

purchased 100 ecstasy tablets from Rinderknect on six occasions between February and May 2000. During this period, Gall traveled from Iowa City, Iowa, to Pell, Iowa, to purchase ecstasy from Rinderknect.

In May 2000, Rinderknect decided to move to Burbank, California. Before leaving Iowa, he arranged a meeting with Gall and Theodore Sauerberg to facilitate the ongoing distribution of ecstasy in his absence. During the meeting, the parties agreed that Sauerberg would accept delivery of ecstasy from Rinderknect and transfer the drugs to Gall. When Gall received the drugs from Sauerberg, he distributed them to other individuals, including Ross Harbison, Jason Story, Brooks Robinson, Mark Goodding, and Corey Coleman. After receiving payment from his customers, Gall delivered the drug proceeds to Sauerberg. Sauerberg then delivered the cash to Rinderknect.

One month after the initial meeting in Iowa City, Rinderknect mailed a package containing 5,000 tablets of ecstasy to Sauerberg in Iowa City. Sauerberg then distributed the ecstasy to Gall in 1,000 tablet increments. Pursuant to the agreement, Gall distributed the ecstasy to other individuals, including Coleman who purchased a total of 1,500 to 2,000 tablets. Gall knew his customers were redistributing the drugs within the community. As the drugs were distributed, Gall paid Sauerberg for the ecstasy. After Sauerberg collected the $85,000 purchase price from Gall, he contacted Rinderknect who flew to Iowa and obtained the cash.

Approximately one to two months later, Rinderknect mailed a second package containing 5,000 tablets of ecstasy to Sauerberg in Iowa City. Again, Sauerberg distributed the ecstasy to Gall in 1,000 tablet increments. After distributing the ecstasy, Gall remitted $85,000 to Sauerberg, who delivered the money to Rinderknect.

In September 2000, Gall decided to leave the drug conspiracy. Rinderknect traveled to Iowa City and met with Gall. Gall told Rinderknect that he was getting out

of the drug business over concerns that Sauerberg was telling too many people about their ecstasy distribution business. Rinderknect sold no more ecstasy to Gall as he requested. According to Gall, he stopped selling ecstasy in August 2000 when he moved in with a new roommate and started studying for his major at the University of Iowa. Goodding testified that Gall stopped selling ecstasy in August 2000 because he did not like the trouble of having to deal with people. Gall estimated that he made $30,000 while a member of the ecstasy conspiracy.

After college graduation in 2002, Gall moved to Mesa, Arizona. Federal agents approached Gall in Arizona, requesting to speak with him about his involvement with ecstasy sales while living in Iowa. Unknown to Gall, law enforcement had already arrested Rinderknect and Sauerberg, who had implicated Gall. Gall admitted to the agents his involvement in the conspiracy. In 2004, Gall was charged in an indictment with conspiracy to distribute MDMA. Gall made arrangements to return to Iowa from his home in Winter Park, Colorado, when he learned there was a federal arrest warrant issued for him. Upon his return to Iowa, he turned himself in to federal authorities.

Because Gall withdrew from the conspiracy in September 2000, the parties stipulated that the November 1, 1999 edition of the United States Sentencing Guidelines applied to Gall's offense conduct. The presentence report ("PSR") assigned Gall responsibility for 10,000 tablets of ecstasy. The parties stipulated that for the purpose of calculating a Guidelines sentence, Gall would be held accountable for 2,500 grams of ecstasy, or 10,000 tablets, which under the 1999 Guidelines equals 87.5 kilograms of marijuana. Pursuant to U.S.S.G. § 2D1.1, 87.5 kilograms of marijuana placed Gall at a base offense level of 24. Because he qualified for the safety valve pursuant to U.S.S.G. § 5C1.2, Gall's offense level was reduced by two levels to 22. An additional three-level reduction for acceptance of responsibility resulted in a total offense level of 19.

Gall's criminal history included a conviction for failure to maintain control of his vehicle and underage alcohol possession in March 1997. As part of his sentence, Gall was ordered to pay a fine and undergo treatment for alcohol abuse. No criminal history points were assessed for this conviction pursuant to U.S.S.G. § 4A1.2(c). Gall was also convicted in December 1997 of improper storage of a firearm on a public highway. This conviction added one criminal history point pursuant to U.S.S.G. § 4A1.1(c). Finally, in March 2000, Gall was convicted of possession of marijuana for which he received a deferred judgment; no criminal history points were assigned to this conviction. With a Category I criminal history, Gall's advisory Guidelines range was 30 to 37 months' imprisonment.

At Gall's sentencing hearing, his father, Tom Gall, testified that he had observed a change in his son's life and that his son had started his own business and was doing well. He added that contractors rely on his son for expertise in installing windows. Finally, he commented that his family would be devastated if his son went to jail.

Gall's mother, Vicki Gall, testified that she believed her son realizes that he made a "stupid mistake" and that he has really learned from it. She added that during the last year, her son has become more mature. She concluded by questioning the value of incarcerating someone who had already made positive changes in his life.

Gall's counsel requested a sentence of probation, asserting that Gall was not in need of rehabilitation because he had already done an admirable job of rehabilitating himself. His counsel noted letters of support sent to the district court sent by Gall's friends and family. In addition, his counsel argued that a felony conviction is a severe consequence that would follow Gall throughout his life. Gall's counsel distinguished Gall from the codefendants who received prison sentences by noting Gall's withdrawal from the conspiracy and his assumption of a crime-free lifestyle. Counsel concluded his remarks by reminding the court that Gall's family, along with two

contract employees, "work pretty much exclusively for Mr. Gall" and were depending on Gall.

The government requested a sentence of 30 months' imprisonment, a sentence at the low end of the advisory Guidelines range. The government argued this sentence was appropriate, considering Gall already received a significant benefit by being sentenced under the 1999 Guidelines. In 1999, the Guidelines stated that 1 gram of ecstasy equated to 35 grams of marijuana. The current Guidelines equate 1 gram of ecstasy to 500 grams of marijuana, which is 14 times the conversion quantity that Gall faced. In addition, Gall's recommended sentence only included drug quantities for the period of his participation in the conspiracy not foreseeable drug quantities during the entire conspiracy. Also, Gall benefitted from a two-level safety-valve reduction. Finally, the government argued that a 30-month sentence was appropriate because the other coconspirators also received prison sentences.

Before announcing its sentence, the district court denied a defense request to depart from the advisory Guidelines range based upon aberrant behavior and extraordinary acceptance of responsibility. The court concluded that departure requests for remorse, post-offense rehabilitation, and voluntary cessation of criminal activity were best considered within the confines of 18 U.S.C. § 3553(a).

After considering the Guidelines, the district court stated, both at the hearing and in its subsequent sentencing memorandum, that it was going to impose a sentence other than that contemplated by the Guidelines and sentenced Gall to 36 months' probation. In imposing the sentence of probation, the court stated that it had considered the § 3553(a) factors. Particularly, the court stated that it took into account "the defendant's voluntary and explicit withdrawal from the conspiracy in September of 2000; the defendant's exemplary behavior while on bond; the support manifested by family and friends who have attested to the defendant's character; the lack of criminal history, especially a complete lack of any violent criminal history; and the immaturity of the defendant."

Regarding the nature and circumstances of the offense under § 3553(a)(1), the district court noted that Gall had withdrawn from the conspiracy, the offense did not involve violence or firearms, and the offense level was derived solely on the basis of drug amounts.

As to the character of the defendant, the court stated that all of Gall's criminal conduct, including the present offense, occurred when he was 21 years old or younger, citing the Supreme Court's analysis in *Roper v. Simmons*, 543 U.S. 551, 569 (2005), that studies indicate that adolescents are less culpable than adults for their actions and "a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualitites often result in impetuous and ill-considered actions and decisions." While acknowledging the decision's limited applicability to those who commit a death-eligible crime before the age of 18, the district court concluded that a National Institute of Health Study "confirms there is no bold line demarcating at what age full maturity is reached." Therefore, the court determined that Gall's age at the time of the offense should be considered in "discovering the overall characteristics of the defendant."

In addition, the court noted Gall's "exemplary" post-offense behavior, including earning his college degree and owning his own business. The court referred to the correspondence it had received, which described Gall as "reliable, honest, friendly, and polite" with "superior work ethic and valuable resources." The district court stated that it could "only conclude from the defendant's post-offense conduct that he has, in fact, learned from his experience with the United States criminal justice system and admirably moved to secure a better future for himself."

Finally, under § 3553(a)(2)(A), the court considered the need for the sentence imposed to reflect the seriousness of the offense. The court stated that the best way to accomplish this goal was to impose a term of probation because "[a]ny term of imprisonment in this case would be counter effective by depriving society of the

contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life."

The district court sentenced Gall to a term of 36 months' probation as a reflection of "the seriousness of joining a conspiracy to distribute MDMA or Ecstacy." Recognizing that probation is not recommended when the Guidelines range falls outside of Zone A, the district court concluded that probation was nevertheless appropriate because Gall's offense level was based "solely on drug quantity." The court stated, "While not denigrating the seriousness of the offense conduct in this case, the Court finds the offense level based solely upon drug quantity does not adequately reflect the offense conduct."

The government now appeals, arguing that the sentence is unreasonable in light of all of the § 3553(a) factors because the district court (1) gave unreasonable weight to Gall's withdrawal from the conspiracy; (2) improperly relied on studies showing that adolescents are less culpable for their actions than adults; (3) gave unreasonable weight to Gall's post-offense rehabilitation and behavior while on pre-trial release; (4) failed to acknowledge that Gall's lack of criminal history was accounted for in the Guidelines calculation; (5) incorrectly concluded that a sentence of probation reflects the seriousness of the offense; (6) did not consider whether a sentence of probation affords adequate deterrence to future criminal conduct; and (7) did not consider whether a sentence of probation creates unwarranted sentencing disparities among defendants with similar records who committed similar crimes.

## II. *Discussion*

"Under *Booker*, the sentencing guidelines are no longer a mandatory regime. Instead, the district court must take the advisory guidelines into account together with other sentencing factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Claiborne*, 439 F.3d 479, 480 (8th Cir. 2006). To determine the proper sentence, "the district court must first calculate the applicable guidelines sentencing range." *Id.*

-7-

After calculating the advisory Guidelines range, the district court "may then impose a sentence outside the range in order to 'tailor the sentence in light of the other statutory concerns' in § 3553(a)." *Id*. (quoting *United States v. Booker*, 543 U.S. 220, 245–46 (2005)).

In the present case, neither party challenges the district court's determination of the Guidelines sentencing range; therefore, "we review the resulting sentence for reasonableness, a standard akin to our traditional review for abuse of discretion." *Id*. at 481.

"We have determined that a sentence imposed within the guidelines range is presumptively reasonable." *United States v. Myers*, 439 F.3d 415, 417 (8th Cir. 2006). "While it does not follow that a sentence outside the guidelines range is unreasonable," a sentence outside of the Guidelines range "'may be unreasonable if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper factor or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.'" *Id*. at 417–18 (quoting *United States v. Haack*, 403 F.3d 997, 1004 (8th Cir. 2005).

The district court must clearly explain why it imposed a sentence outside of the Guidelines range. *United States v. Gatewood*, 438 F.3d 894, 896 (8th Cir. 2006). While we do not require "a rote recitation of each § 3553(a) factor," the district court should explain why it varied from the Guidelines and the extent of the variance. *Id*. "'Sentences varying from the guidelines range . . . are reasonable so long as the judge offers appropriate justification under the factors specified in 18 U.S.C. 3553(a). How compelling that justification must be is proportional to the extent of the difference between the advisory range and the sentence imposed.'" *Claiborne*, 439 F.3d. at 481 (quoting *United States v. Johnson*, 427 F.3d 423, 426–27 (7th Cir. 2005)). Therefore, "the farther the district court varies from the presumptively reasonable guidelines

range, the more compelling the justification based on the § 3553(a) factors must be." *United States v. McMannus*, 436 F.3d 871, 874 (8th Cir. 2006).

Here, the district court imposed a sentence of probation when the bottom of Gall's advisory Guidelines range was 30 months' incarceration. In essence, this amounts to a 100% downward variance, as Gall will not serve any prison time. Such a variance is extraordinary. "An extraordinary reduction must be supported by extraordinary circumstances." *United States v. Dalton*, 404 F.3d 1029, 1033 (8th Cir. 2005); *see also Claiborne*, 439 F.3d at 481 (holding that the district court's imposition of a 15-month sentence when the Guidelines range was 37 to 46 months' imprisonment, a 60% downward variance, was unreasonable). We conclude that this extraordinary variance is not supported by extraordinary justifications.

First, the district court gave too much weight to Gall's withdrawal from the conspiracy because the court failed to acknowledge the significant benefit Gall received from being subject to the 1999 Guidelines. Gall was held responsible for 10,000 tablets of MDMA at a conversion rate of 1 gram of MDMA to 35 grams of marijuana, resulting in a base offense level of 24. Under the current Guidelines, however, Gall's base offense level would have been 32 because 1 gram of MDMA equates to 500 grams of marijuana. In addition, Gall was not held accountable for quantities of ecstasy distributed by other members of the conspiracy subsequent to his withdrawal. Under U.S.S.G. § 1B1.3, Gall could have been held responsible for other members' reasonably foreseeable acts. *United States v. Smith*, 240 F.3d 732, 737 (8th Cir. 2001) ("A defendant convicted of conspiracy is properly held accountable for all reasonably foreseeable acts and omissions of any co-conspirator taken in furtherance of the conspiracy.").

Second, the district court gave significant weight to an improper factor when it relied on general studies showing persons under the age of 18 display a lack of maturity, which often results in impetuous and ill-considered actions. This general study, however, does not explain how Gall's specific behavior in the instant case was

impetuous or ill-considered. Furthermore, Gall sold ecstacy as a 21-year-old adult, not as an adolescent.

Third, the district court did not properly weigh the seriousness of Gall's offense. While the district court observed that Gall's offense level did not adequately reflect the offense conduct because it was based "solely on drug quantity," the district court ignored the serious health risks ecstasy poses. Ecstasy causes increased body temperature, which can lead to liver, kidney, and cardiovascular system failure; increases in heart rate and blood pressure; and severe anxiety and depression, which can occur days or weeks after taking ecstasy. *National Institute on Drug Abuse,* (2003), *at* www.nida.nih.gov/infofax/ecstasy.html (last visited March 31, 2006). Gall sold 10,000 ecstasy pills during the time he participated in the drug conspiracy. The potential harm posed by this quantity of illegal drugs should not be lightly discounted.

Fourth, the record does not show that the district court considered whether a sentence of probation would result in unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). "Congress has made avoiding unwarranted disparity a legislative priority." *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006). Therefore, we find that the district court failed to consider a relevant factor that should have received significant weight.

Finally, the district court placed too much emphasis on Gall's post-offense rehabilitation. Even if Gall's rehabilitation "is dramatic and hopefully permanent," a sentence of probation for participating as a middleman in a conspiracy distributing 10,000 tablets of ecstasy with a personal profit of $30,000 "'lies outside the limited range of choice dictated by the facts of the case.'" *Id*. (quoting *Haack*, 403 F.3d at 1004).

### III. *Conclusion*

Accordingly, the judgment of the district court is reversed and the case is remanded to the district court for resentencing.

_____