# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

IHAB MASALMANI,

        Defendant-Appellant.

UNPUBLISHED
September 22, 2016

No. 325662
Macomb Circuit Court
LC No. 2009-005244-FC

Before: BORRELLO, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

Defendant was convicted at a jury trial of first-degree felony murder, MCL 750.316(1)(b), carjacking, MCL 750.529a, conspiracy to commit carjacking, MCL 750.529a; MCL 750.157a, kidnapping, MCL 750.349, conspiracy to commit kidnapping, MCL 750.349; MCL 750.157a, larceny from the person, MCL 750.357, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was originally sentenced to mandatory life imprisonment without the possibility of parole for the first-degree felony murder conviction, 25 to 50 years' imprisonment each for the carjacking, conspiracy to commit carjacking, kidnapping, and conspiracy to commit kidnapping convictions, 5 to 10 years' imprisonment for the larceny from the person conviction, and two years' imprisonment for the felony-firearm conviction.[1] On defendant's appeal by right, this Court affirmed defendant's convictions but vacated his mandatory sentence of life imprisonment without the possibility of parole for the first-degree felony murder conviction and remanded for resentencing on that offense in accordance with *Miller v Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012). *People v Masalmani*, unpublished opinion per curiam of the Court of Appeals, issued March 19, 2013 (Docket Nos. 301376, 301377, 301378), p 7. The trial court on remand resentenced defendant to life imprisonment without the possibility of parole for the first-degree

---

[1] Defendant was also convicted of and sentenced for numerous other charges in two other cases that were consolidated for trial with the instant case, and this Court affirmed those convictions and sentences. See *People v Masalmani*, unpublished opinion per curiam of the Court of Appeals, issued March 19, 2013 (Docket Nos. 301376, 301377, 301378), pp 1-2. Those two cases that were consolidated with the instant case are not presently before this Court, and we therefore do not list those convictions and sentences.

felony murder conviction. Defendant now appeals by right the sentence imposed on remand. We affirm.

Defendant argues that the trial court erred in imposing a life without parole sentence on remand. We disagree. "[T]he appropriate standard of review in cases where a judge imposes a sentence of life without parole on a juvenile defendant is a common three-fold standard . . . ." *People v Hyatt*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 325741); slip op at 25. The trial court's findings of fact are reviewed for clear error, questions of law are reviewed de novo, and the court's ultimate determination as to an appropriate sentence is reviewed for an abuse of discretion. *Id*.

In *Miller*, 132 S Ct at 2460, the United States Supreme Court held that a sentence of "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' "

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. [*Id*. at 2468.]

"By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id*. at 2469. The Supreme Court declined to consider the defendants' arguments for a categorical prohibition of life without parole sentences for juveniles but stated that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id*. The Supreme Court noted that it was difficult to distinguish "at this early age between the juvenile offender whose crimes reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id*. (quotation marks and citations omitted). "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*.

Following the issuance of *Miller*, our Legislature enacted MCL 769.25, which became effective on March 4, 2014. See 2014 PA 22. The statute applies to a defendant who was less than 18 years old at the time he or she committed the offense. MCL 769.25(1). The prosecutor may file a motion to sentence a defendant convicted of first-degree murder to life without parole. MCL 769.25(2) and (3). If the prosecutor files such a motion in conformance with the statutory requirements, the trial court must conduct a hearing at which the court considers the factors listed

in *Miller* and any other relevant criteria, including the defendant's prison record. MCL 769.25(6). At the hearing, the trial court must specify the aggravating and mitigating circumstances and the reasons for the sentence imposed; the court may consider evidence presented at trial and evidence presented at the sentencing hearing. MCL 769.25(7). If the trial court declines to impose a life without parole sentence, the court must impose a sentence in which the maximum term is at least 60 years and the minimum term is between 25 and 40 years. MCL 769.25(9).

Although the trial court's ultimate determination of the appropriate sentence is reviewed for an abuse of discretion, "the imposition of a juvenile life-without-parole sentence requires a heightened degree of scrutiny regarding whether a life-without-parole sentence is proportionate to a particular juvenile offender, and even under this deferential standard, an appellate court should view such a sentence as inherently suspect." *Hyatt*, ___ Mich App at ___; slip op at 26. "[A]ppellate review of a juvenile life-without-parole sentence cannot be a mere rubber-stamping of the penalty handed out by the sentencing court." *Id*. Although such a sentence is not presumed to be unconstitutional, a searching inquiry into the record must be undertaken with "the understanding that, more likely than not, the sentence imposed is disproportionate." *Id*. A sentencing court abuses its discretion if it " 'fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.' " *Id*. at 27, quoting *United States v Haack*, 403 F3d 997, 1004 (CA 8, 2005).

In *Hyatt*, ___ Mich App at ___; slip op at 27-28, this Court concluded that the trial court had failed to adhere to the directives in *Miller* and its progeny "about the rarity with which a life-without-parole sentence should be imposed." Although the trial court in *Hyatt* focused on the *Miller* factors, "the court gave no credence to *Miller*'s repeated warnings that a life-without-parole sentence should only be imposed on the rare or uncommon juvenile offender." *Hyatt*, ___ Mich App at ___; slip op at 28. Moreover, the trial court in *Hyatt* had emphasized a psychologist's opinion that the defendant's prognosis for change *in the next five years* was poor; the focus on a five-year period was inconsistent with the holding in *Miller* "that a life-without-parole sentence will be proportionate for the juvenile who is irreparably corrupt and incapable of change – not one who is incapable of change within the next five years." *Id*. This Court therefore remanded the case for resentencing and directed the trial court "to not only consider the *Miller* factors, but to decide whether this individual is the truly rare juvenile mentioned in *Miller* who is incorrigible and incapable of reform." *Id*.

In the present case, the trial court did not err in analyzing each of the *Miller* factors and finding that defendant is the rare juvenile offender who is irreparably corrupt. The trial court expressed full appreciation of the rarity of the circumstances in which a juvenile offender will be deemed incapable of reformation. The court quoted and discussed relevant portions of the holding and analysis in *Miller,* and noted the admonition in *Miller* that appropriate occasions to sentence juveniles to life without parole will be uncommon. Then, after analyzing the *Miller* factors, the trial court concluded "that defendant's case presents precisely what the Supreme Court characterized as the 'rare juvenile offender whose crime reflects irreparable corruption.' " Accordingly, the trial court accorded appropriate recognition and made pertinent findings

regarding the rarity of circumstances warranting a life without parole sentence for a juvenile offender.

Moreover, the trial court's conclusion that defendant is the rare juvenile offender for whom a life without parole sentence is warranted was supported by the court's accurate analysis of the *Miller* factors. We will now discuss each of the *Miller* factors.

The first factor concerns defendant's age and its hallmark features. *Miller*, 132 S Ct at 2468. Defendant was 17 years and 8 months old when he committed the offenses (in marked contrast to the 14-year-old defendants in *Miller*, 132 S Ct at 2460[2]). The record refutes any claim that the hallmark features of adolescence identified in *Miller*, 132 S Ct at 2468, including immaturity, impetuosity, and a failure to appreciate risks and consequences, played any role in defendant's crimes. This was not, as in *Miller*, 132 S Ct at 2465, a mere botched robbery that turned into a killing. Defendant engaged in an unusually horrific, disturbing, and violent crime spree that extended over a three-day period. Defendant, aided by codefendant Robert Taylor, brazenly and forcibly kidnapped and carjacked Matt Landry in broad daylight outside a restaurant, punched and dragged him by the neck, drove his car, held him captive for at least seven hours, used his ATM card to steal his money and buy numerous items. He then took Landry to a drug house where defendant bought and consumed crack cocaine. Finally, defendant took Landry to a nearby vacant house where he killed him in a brutal execution style by shooting him in the back of the head. Defendant then committed additional violent crimes over the next two days, including robbing a bank and its customers, kidnapping a bank customer, and another carjacking. Landry's significantly decomposed body was found two days later inside the vacant burned out house where he had been shot in the back of the head. From the position of the body, it appeared that Landry had been kneeling at the time of his murder. Defendant's criminal actions over an extended period of time are not reflective of a merely immature or impetuous adolescent who fails to appreciate risks and consequences.

Defendant relies on testimony by Dr. Daniel P. Keating, defendant's expert in cognitive and brain development in adolescents, about a developmental maturity mismatch in which an adolescent's limbic system matures more quickly than the prefrontal cortex. This testimony has minimal bearing on these facts, and Dr. Keating did not meet or interview defendant. He was

---

[2] The Supreme Court in *Miller* indicated that it is appropriate to take into account the differences between juveniles of different ages. In particular, when explaining the flaws of a scheme of mandatory life imprisonment without parole for juveniles, the *Miller* Court said: "Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one." *Miller*, 132 S Ct at 2467-2468. The *Miller* majority criticized the dissents in *Miller* for repeatedly referring to 17-year-olds who have committed heinous offenses and comparing those defendants to the 14-year-old defendants in *Miller*. The *Miller* majority explained: "Our holding requires factfinders to attend to exactly such circumstances – to take into account the differences among defendants and crimes. By contrast, the sentencing schemes that the dissents find permissible altogether preclude considering these factors." *Id*. at 2469 n 8.

only addressing generic brain science. Defendant's reliance on Dr. Keating's testimony that the prefrontal cortex is not fully developed until a person reaches his or her middle twenties fails to consider that an offender who is only four months older than defendant is subject to a *mandatory* life without parole sentence. Dr. Keating acknowledged that a person who is 17 years and 8 months old is not significantly different in brain development from an 18-year-old person. Also, William Ladd, who was defendant's lawyer guardian ad litem (LGAL) for many years, testified that defendant fell within the middle range in terms of maturity of the 5,000 to 8,000 children with whom Ladd had worked in his 30 years of experience. In sum, defendant's chronological age and its hallmark features do not weigh in favor of mitigation.

The next factor concerns defendant's family and home environment. *Miller*, 132 S Ct at 2468. The trial court correctly noted that there was uncontroverted testimony that defendant had a terrible family and home environment, having been subjected to abuse and neglect by relatives in the United States after having been sent here from Lebanon as a child. Defendant was placed in at least 10 foster homes. He was diagnosed with ADHD, depression, and pediatric seizures. Services meant to address his special needs were not continuously provided. Further, cultural and linguistic considerations were not adequately taken into account. As defendant was moved from one foster care placement to another, he lost the ability to form attachments with parental figures and became more oriented toward being out on the streets, eventually becoming involved in gangs. In school, defendant struggled academically and began getting into fights and exhibiting disrespect to his teachers. Defendant had juvenile delinquency cases for assault and drug offenses; he pleaded guilty to misdemeanors and became a delinquent court ward. In light of the terrible circumstances of defendant's family and home environment, the trial court properly weighed this factor in favor of defendant and against a life without parole sentence.

The next factor is "the circumstances of the homicide offense, including the extent of [defendant's] participation in the conduct and the way familial and peer pressures may have affected him." *Miller*, 132 S Ct at 2468. As discussed, defendant actively participated in the crimes. There is no indication that any family or peer pressure led defendant to commit the crimes. Defendant held Landry captive for at least seven hours, used his ATM card to obtain Landry's money, purchased multiple items with that money, took Landry to a drug house where defendant consumed crack cocaine, and then took Landry to a nearby vacant house where defendant shot Landry in the back of the head in a cold-blooded execution-style murder. Defendant then committed additional violent crimes over the next two days and used Landry's vehicle as a getaway car. Defendant had more than ample opportunity to abandon his criminal acts during the many hours that he held Landry captive and used his money before killing him in a brutal fashion. Given defendant's extensive participation in these disturbing criminal acts and the absence of any family or peer pressure on defendant, the trial court did not err in heavily weighing this factor against defendant and concluding that it did not favor mitigation.

The next *Miller* factor is whether defendant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." *Miller*, 132 S Ct at 2468. The trial court correctly noted that there is no evidence of any incapacities of youth that rendered defendant unable to participate in his defense or that led him to implicate himself. This factor therefore did not weigh in favor of mitigation.

The final factor is the possibility of rehabilitation suggested by the circumstances. *Miller*, 132 S Ct at 2468. Dr. Keating explained that a person's prospects for rehabilitation are associated with his or her developmental history. Negative experiences and behaviors during a person's developmental period increase the probability that the person will not succeed in rising above difficulties. Some people do not change; the worse the circumstances, the more likely that the person will not overcome their circumstances. Greater rehabilitation challenges exist for someone who purposely shot another.

Dr. Lyle Danuloff, a clinical psychologist who met with defendant for more than four hours over three different visits, explained that when defendant committed the crimes in this case, he was unattached in human relationships, living on the streets, and living an amoral life "with the sense of what do I need and what do I need to do to get my needs met. He lived in the moment and did not live with any sense of right and wrong." When defendant committed the crimes, he was AWOL from his last placement, running the streets with other young people, consuming marijuana, selling drugs, and lacking any personhood in terms of relating to other people as fellow human beings rather than objects to meet his needs. Dr. Danuloff thinks that defendant has experienced turning points in his development. Defendant "got lucky" because he was placed in segregation where he is alone in his cell 23 hours a day and because he learned about the *Miller* decision, so he now has a hope of someday obtaining a parole hearing. While alone in his cell, defendant began to read the Bible and other books to learn how people treat one another and the difference between righteousness and evil. Dr. Danuloff opined that the possibility of a parole hearing motivated defendant to begin to explore himself and try to understand who he is, what he did, and why he did it. In Dr. Danuloff's view, defendant is beginning to have a very primitive and embryonic capacity to explore himself and ask questions about himself. Defendant stopped getting misconduct tickets in prison. Defendant also became a prison barber and a representative of his prison housing unit.

Dr. Danuloff testified that defendant said that "[e]ven a Godly person can punish people who bring harm to them. Even God did this." When asked whether what he did in this case was righteous or evil, defendant said that "it was a little bit of both." Defendant explained, "[W]ell, I didn't have any choice. It's how I was, it's how I lived, it's how I behaved." Defendant said, "I couldn't think of anything else to do. I was in a situation and I had to get—and I had to take care of the situation I was in." When asked how his actions were evil, defendant said that he hurt people badly, which indicates to Dr. Danuloff "the embryonic development of personhood." Dr. Danuloff thinks defendant is in the rudimentary stages of growing up by using people like Jesus and Muhammad as teachers and internalizing what he reads. Dr. Danuloff indicated that there is no way for a psychologist to predict how a person will behave in the future.

On cross-examination, Dr. Danuloff acknowledged that people normally cannot fix psychological problems by themselves and that psychotherapy is needed. Psychotherapy requires introspection and a willingness to work on oneself. Dr. Danuloff agreed that he saw defendant in the structured prison setting years after the crimes were committed and that he cannot say what defendant would be like if released.

The trial court correctly concluded that this factor did not favor mitigation. Although the difficulty of defendant's upbringing weighs in his favor, it also indicates that he faces significant challenges in improving himself, as reflected in the testimony of Dr. Keating and Dr. Danuloff.

We share the trial court's concern about defendant's comments to Dr. Danuloff reflecting that defendant thinks his actions in this case were partially righteous and that he did not have a choice. As discussed, defendant had more than ample opportunity to abandon his criminal activity in the many hours that he held Landry captive before brutally killing him. Hence, defendant's abhorrent belief that his actions were partially righteous and that he had no choice but to behave as he did, despite the horrific nature of his criminal acts committed over an extended period of time, indicates that defendant's prospects for rehabilitation are extremely remote or nonexistent. Defendant continued engaging in assaultive behavior after being incarcerated for the present offenses. He assaulted or attempted to assault staff personnel at the Macomb County Jail several times. After being transferred to prison, defendant incurred 23 misconduct tickets. Four of the tickets were for fighting, two were for engaging in threatening behavior, two were for possessing a weapon, one was for assault and battery of another prisoner, and another one was for assault resulting in serious physical injury to another prisoner. The fact that defendant stopped misbehaving in prison after learning of *Miller* does not necessarily reflect a rudimentary moral awakening, as Dr. Danuloff claimed. Defendant's improved behavior is just as, if not more, likely to reflect manipulation designed to obtain a lesser sentence, as the trial court found. This conclusion is also consistent with defendant's earlier diagnosis of antisocial personality disorder and the manipulative behaviors associated with that condition. Dr. Danuloff testified that persons diagnosed with antisocial personality disorder do not generally participate in psychotherapy unless mandated to do so and that the prognosis for such mandatory treatment is not positive. Moreover, even if defendant is beginning to exhibit a very rudimentary or embryonic capacity for self-exploration, we note Dr. Danuloff's testimony supports the trial court's conclusion that defendant is unlikely to make significant progress without intensive professional assistance, and no basis exists to conclude that he will receive intensive professional assistance in prison and achieve full rehabilitation. The trial court properly concluded that defendant's prospects for rehabilitation are negligible.

Overall, our review of the record indicates that the trial court accurately analyzed each of the *Miller* factors and correctly concluded that defendant is the rare juvenile offender whose crime reflects irreparable corruption. The trial court therefore did not abuse its discretion in determining that defendant should be sentenced to life imprisonment without parole.

Defendant next argues that the trial court erred in failing to empanel a jury at the *Miller* resentencing hearing. We disagree. This issue presents a question of law, which is reviewed de novo. *Hyatt*, ___ Mich App at ___; slip op at 2. Because defendant failed to preserve this issue by raising it below, *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007), our review is for plain error affecting substantial rights, *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

In *People v Skinner*, 312 Mich App 15, 20; 877 NW2d 482 (2015), rejected by *Hyatt*, ___ Mich App at ___; slip op at 21, the majority of a panel of this Court held "that the Sixth Amendment mandates that juveniles convicted of homicide who face the possibility of a sentence of life without the possibility of parole have a right to have their sentences determined by a jury." In *People v Perkins*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket Nos. 323454, 323876, 325741); vacated in part by *People v Perkins*, unpublished order of the Court of Appeals, entered February 12, 2016 (Docket Nos. 323454, 323876, 325741), and superseded in part by *Hyatt*, ___ Mich App at ___; slip op at 1, 21, another panel of this Court followed

*Skinner* only because it was obligated to do so, MCR 7.215(J)(2), and stated its opinion that *Skinner* was wrongly decided. In *Hyatt*, ___ Mich App at ___; slip op at 21, a conflict panel of this Court[3] rejected the analysis in *Skinner* and expressed agreement with the original panel in *Perkins*. The *Hyatt* conflict panel summarized its analysis as follows:

> In sum, we find that *Miller*'s individualized sentencing mandate, as incorporated by MCL 769.25, does not run afoul of Sixth Amendment precedent. A judge, not a jury, is to make the determination of whether to impose a life-without-parole sentence or a term-of-years sentence under MCL 769.25. Accordingly, we reject the result reached in *Skinner* and conclude that the prior panel in this case was correct in its analysis. [*Hyatt*, ___ Mich App at ___; slip op at 21.]

Therefore, the trial court in this case did not err by failing to empanel a jury at the *Miller* hearing because the conflict panel in *Hyatt* rejected the portion of *Skinner* on which defendant relies.

We affirm.

/s/ Jane E. Markey
/s/ Michael J. Riordan

---

[3] Before the issuance of the conflict panel's opinion in *Hyatt*, the conflict panel issued an order vacating an earlier order that had consolidated *Perkins*, *Hyatt*, and another case, so that only *Hyatt* proceeded before the conflict panel. See *People v Perkins*, unpublished order of the Court of Appeals, issued April 26, 2016 (Docket Nos. 323454, 323876, 325741). That is why the conflict panel's opinion was decided under a different case name.