# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 03-3478

_____

United States of America,    *
                             *
       Appellee,    *
                             *
v.    *
                             *
Alfred K. Ryder,    *
                             *
       Appellant.    *


_____

No. 03-3479

_____

United States of America,    *

       Appellee,    *

v.    *

Mary Ann Ryder,    *

       Appellant.    *

Appeals from the United States
District Court for the
Southern District of Iowa.

[PUBLISHED]

_____

Submitted: May 11, 2004
Filed: July 14, 2005

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

HANSEN, Circuit Judge.

Alfred K. Ryder and his wife Mary Ann Ryder each appeal their respective convictions related to bankruptcy fraud in these consolidated appeals. Following oral argument, both appellants also filed supplemental motions, which we have considered, seeking review of their respective sentences under Blakely v. Washington, 124 S. Ct. 2531 (2004), and United States v. Booker, 125 S. Ct. 738 (2005). We affirm both of the defendants' convictions, but remand to the district court for resentencing in light of Booker.

## I. Background

On July 6, 1995, Alfred and Mary Ann Ryder, as individuals, filed for protection against creditors under Chapter 7 of the Bankruptcy Code. The Ryders took the position that all of their farming assets were owned by a corporation rather than by themselves personally, and they did not disclose in their personal bankruptcy schedules any real property, livestock, crops, or farm equipment. Based on their failure to disclose assets from their farming operation to the bankruptcy trustee throughout the drawn out bankruptcy proceedings, a grand jury indicted the Ryders on federal bankruptcy fraud charges in December 2002. On May 9, 2003, a jury found Alfred and Mary Ann guilty on several counts. The bankruptcy proceeding still had not been concluded at the time of the criminal trial.

Following a jury's verdict, we state the facts in the light most favorable to the verdict. United States v. Maxwell, 363 F.3d 815, 817 (8th Cir. 2004). Alfred and Mary Ann Ryder have farmed in southern Iowa for many years. At the time they filed for bankruptcy, they, or entities they controlled, owned approximately 4,300 acres of farmland in Iowa, Missouri, and Illinois. Alfred took care of the business end of the

2

farming operation while Mary Ann primarily provided manual labor. Alfred's brother, Thomas Ryder, also farmed in Illinois and incorporated Ryder Farms, Inc. of Illinois in the late 1970s. Alfred and Mary Ann incorporated Ryder Farms, Inc. of Iowa[1] in 1986. Numerous deeds were recorded throughout the 1980s, purporting to convey various parcels of farmland between the Ryders and the two corporations. The corporate documents of Ryder Farms, Inc. of Iowa varied from year to year regarding the named officers and directors as well as whether the corporation owned any farmland. Documents filed with the Secretary of State listed Alfred and Mary Ann as the named officers and directors through 1995, but the documents were changed after the Ryders filed for bankruptcy to list Thomas Ryder, Lucille Ryder, and Jane Ryder as the named officers and directors, even though Lucille had died in July 1994.

In the Chapter 7 proceedings, Alfred Ryder originally denied any ownership interest in Ryder Farms, Inc. of Iowa. Throughout various hearings, Alfred testified that he and Mary Ann had given their stock in Ryder Farms, Inc. of Iowa to Thomas and Lucille Ryder long before they filed for bankruptcy. He also testified that Ryder Farms, Inc. of Iowa owned no land, and that it had transferred land in the past to Ryder Farms, Inc. of Illinois, which it then leased back from Ryder Farms, Inc. of Illinois. Alfred changed his testimony in a May 1999 bankruptcy hearing, testifying that the farmland was owned by Ryder Farms, Inc. of Iowa. Thomas Ryder's son, a director of Ryder Farms, Inc. of Illinois, testified at the criminal trial that Ryder Farms, Inc. of Illinois had never owned any real property.

The Ryders also failed to disclose to the bankruptcy trustee their entitlement to government subsidy payments for their participation in the conservation reserve

---

[1]Both corporations were incorporated as "Ryder Farms, Inc.," but for ease of discussion, we will refer to the corporation formed by Thomas as "Ryder Farms, Inc. of Illinois" and the corporation formed by Alfred as "Ryder Farms, Inc. of Iowa."

program (CRP), whereby they, as individuals, received government payments for keeping part of their farmland idle. Until 1996, they had reported to the relevant county Farm Service Agency (FSA) that the producer for the land involved in the CRP program was Ryder Farms, Inc. of Iowa, of which they each owned a 50% interest. They changed the reporting in 1996 (after they filed for bankruptcy) to list themselves individually as the "producers" to maximize the amount of payments for which they were eligible under the program. In changing the listed "producer" for subsidy purposes, the Ryders reported to the FSA that they had dissolved Ryder Farms, Inc. of Iowa.

Additionally, the Ryders concealed Mary Ann's interest in land in Illinois and income she received from renting that property. Mary Ann and her two sisters inherited farmland in Scott County, Illinois, from their grandfather following the termination of their father's life estate upon his death in 1988. Mary Ann and her sisters held the land as tenants in common. Although there was no evidence that Mary Ann's grandfather's will was ever probated, Mary Ann's sister, Margaret McGlasson, testified that they had inherited the land and began renting the land to Bruce Dahman after her father's death, dividing the profits equally. Mary Ann paid her share of property taxes on the land. Neither the Scott County, Illinois, land nor an entitlement to the rent payments was listed on the bankruptcy schedules, and both Alfred and Mary Ann told the bankruptcy trustee that they had no interest in any land in Illinois.

The evidence at trial also showed that the Ryders failed to disclose ownership of land in Wayne County, Iowa. A few months after filing for bankruptcy, Alfred Ryder purchased 244 acres of farmland in Wayne County, Iowa, by posing as his brother, Thomas. The property was placed in the name of Napland Farms (Napland is Mary Ann's maiden name), which Alfred claimed was formed by a group of hunters. Although Alfred told the bankruptcy trustee that none of his or Mary Ann's funds were used by Napland Farms to purchase the land, Mary Ann's social security

4

number was associated with Napland Farms. The land was paid for with a $30,045 cashier's check listing Napland Farms as the remitter and a $30,000 money order purporting to bear the signature of Thomas Ryder. Thomas Ryder's son testified at the criminal trial that the signature was not his father's. The attorney representing the estate from which Alfred purchased the land also testified at the criminal trial and identified Alfred as the person who posed as Thomas Ryder in the transaction.

Even after the trustee discovered the Ryders' interest in various parcels of land and attempted to bring the property into the bankruptcy estate, Alfred Ryder continued to thwart the trustee's efforts. On January 12, 2000, Alfred, acting in his capacity as president, filed a Chapter 12 bankruptcy petition on behalf of Ryder Farms, Inc. of Iowa in the Western District of Missouri, listing the farmland, farm equipment, crops, and livestock in which he had claimed to have no interest in the Chapter 7 bankruptcy case. The Chapter 12 filing triggered an automatic stay for actions involving any of the listed property. The Chapter 12 case was transferred to the Southern District of Iowa and dismissed by the bankruptcy court that was presiding over the Chapter 7 case. Mary Ann was not involved in the Chapter 12 filing. Alfred later filed a Chapter 11 petition on behalf of Ryder Farms, Inc. of Iowa in the Western District of Missouri on March 8, 2002. Again, Mary Ann was not involved in the Chapter 11 filing. It too was transferred to the Southern District of Iowa and dismissed by the bankruptcy court. Prior to the dismissal, the automatic stay triggered by the Chapter 11 filing prevented the Chapter 7 trustee from proceeding with a planned sale of land in Missouri.

Alfred and Mary Ann were indicted as codefendants on one count of conspiring to conceal assets, 18 U.S.C. § 371, and four counts of concealing assets, 18 U.S.C. § 152(1)&(2). Alfred was also indicted on thirteen counts of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i). A jury convicted Alfred of the conspiracy count, all four counts of concealment of assets, and nine of the money laundering counts. A final order of forfeiture in the form of a personal money judgment in the amount of

$136,301.79 was entered upon the jury's guilty verdict on the money laundering counts. See 18 U.S.C. § 982(a)(1); Fed. R. Crim. P. 32.2(b)(3). The district court sentenced Alfred to 41 months of imprisonment. Mary Ann was convicted of the conspiracy count and two of the concealment counts–one count related to real property in Illinois, and one count related to farm equipment, livestock, and crops. She was acquitted of the other two concealment counts. Mary Ann received a sentence of twelve months and one day. On appeal, Alfred argues that there was insufficient evidence presented at trial to support the money laundering convictions. Mary Ann argues that there was insufficient evidence to support her conviction on any of the counts, that the district court erroneously allowed hearsay testimony, and that the district court erred in instructing the jury on reasonable doubt.

## II. Conviction Issues

### A. Alfred Ryder

Following a jury verdict in favor of the government, "[w]e review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Parker, 364 F.3d 934, 943 (8th Cir. 2004) (internal marks omitted). Evidence sufficiently supports a conviction as long as any rational jury could have found the essential elements of the offense beyond a reasonable doubt. United States v. Vanhorn, 296 F.3d 713, 717 (8th Cir. 2002), cert. denied, 537 U.S. 1167 (2003). "[W]e will reverse only if the jury must have had a reasonable doubt concerning one of the essential elements of the crime." Id. (internal marks omitted).

The money laundering charges against Alfred were based on checks representing farm income that were deposited into various checking accounts after the Ryders filed for bankruptcy and that were not disclosed to the bankruptcy trustee.

To establish the money laundering counts, the government needed to prove that Alfred "conducted or attempted to conduct a financial transaction, knowing that the property involved in the transaction represented the proceeds of unlawful activity, and knowing the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity." United States v. Frank, 354 F.3d 910, 919 (8th Cir. 2004); see also 18 U.S.C. § 1956(a)(1)(B)(i).

Alfred contends that the government failed to establish the first element of each of the money laundering counts–that he conducted a financial transaction–because there was no evidence that he deposited any of the checks into the checking accounts. We disagree. The government introduced into evidence copies of each of the checks that formed the basis for the money laundering counts. Other documents containing Alfred's signature were also introduced into evidence. FBI Agent Kevin Kohler testified about his review of the transactions flowing through the various accounts. Five of the twelve checks were deposited into an account opened by Alfred and titled in the name of Ryder Farms, Inc. These checks were issued by MFA-Agri-Services, Prairie-Vu Enterprises, or Lamoni Livestock Auction. Given Alfred's control over the account, evidence that Alfred conducted all of the business transactions of the farming operation, and the jury's ability to compare the endorsements on the checks with other known samples of Alfred's signature, there was sufficient evidence to support Alfred's convictions related to counts 6, 10, 11,13, and 14.

Counts 8, 9, 15, and 16 involve checks issued by Bruce Dahman to Mary Ann Ryder for lease payments on the land that Mary Ann owned with her sisters. Two of the checks (counts 15 and 16) were deposited into an account on which Mary Ann was the only signatory. Although the evidence is less abundant that Alfred engaged in a financial transaction as to these two counts, there was evidence that Alfred controlled the business side of the farming operation and that Alfred signed Mary Ann's name on other documents, including the farm subsidy program papers. Mr.

Dahman testified that Alfred was the main negotiator for Mary Ann and her sisters concerning the land they inherited from their grandfather. Additionally, the jury was able to compare the endorsements on the checks with Alfred's signature on other documents. We cannot say that no jury could have found from this evidence that Alfred deposited the checks into the account.

The other two Dahman checks (counts 8 and 9) were deposited into an account in the name of Napland Farms, listing "Thos. Ryder" as signatory. Thomas Ryder's son testified that the signature card for this account did not bear his father's signature. This evidence, along with evidence that Alfred impersonated Thomas in purchasing land in the name of Napland Farms, provides sufficient circumstantial evidence to support the jury's verdict on counts 8 and 9.

B.    Mary Ann Ryder

1.    Sufficiency of the Evidence

Mary Ann Ryder was convicted of concealing real property in Illinois, and of concealing crops, livestock, and farm equipment from the bankruptcy trustee, as well as conspiring with Alfred to conceal assets. To establish the concealment counts, the government was required to prove beyond a reasonable doubt that Mary Ann "knowingly and fraudulently conceal[ed] from a . . . trustee . . . any property belonging to the estate of a debtor." 18 U.S.C. § 152(1). Mary Ann takes issue with the "knowingly and fraudulently" elements of the crime, arguing that she lacked the requisite intent to have committed the offense of concealing, and therefore conspiring to conceal, assets because she did not know that assets that should have been listed were omitted from the bankruptcy schedules. At most, she argues, she acquiesced in her husband's position that assets allegedly belonging to Ryder Farms, Inc. of Iowa were not property of the bankruptcy estate.

8

Although Mary Ann claims that she was unaware of what assets were supposed to be listed on the schedules, she signed the petition attesting that it listed all of her assets. Mary Ann testified at a bankruptcy proceeding that she had no interest in property located in Illinois, despite the fact that she inherited property from her grandfather in 1988, received rent payments from Bruce Dahman since that time, and annually paid taxes on the property. The property was not listed on the schedules and had nothing to do with Ryder Farms. Mary Ann's claim that she merely acquiesced in Alfred's belief that the farming operation was owned by Ryder Farms, Inc. of Iowa is unavailing as to this property. The evidence supports her conviction for knowingly and fraudulently concealing real property in Illinois from the bankruptcy trustee.

We also conclude that the evidence sufficiently supports her conviction for concealing crops, livestock, and farm equipment from the bankruptcy trustee. Checks from the farming operation were deposited into bank accounts in the name of Mary Ann alone or Mary Ann as a joint owner with Alfred and Thomas. These accounts were not listed on the bankruptcy schedule and checks deposited after the Ryders filed for bankruptcy were not reported to the trustee. Some of the checks deposited into these personal accounts included payments from the sale of livestock and crops, but no livestock, crops, or equipment–including equipment that Mary Ann used on a daily basis in the farming operation–were listed on the bankruptcy schedules.

Mary Ann makes the alternative argument that even if there was sufficient evidence in the abstract to submit the case to the jury, her conviction is so against the weight of the evidence that a new trial is warranted. We will reverse a district court's denial of a motion for a new trial only if the court clearly abused its discretion such that a serious miscarriage of justice may have occurred. See United States v. Huerta-Orozco, 272 F.3d 561, 565-66 (8th Cir. 2001). In deciding whether a miscarriage of justice may have occurred, the district court may weigh the evidence for itself and evaluate the credibility of the witnesses without giving the government the benefit of inferences to be drawn from the evidence. Id. at 565. Having carefully

reviewed the record and the transcript of the trial, we cannot say that the district court clearly erred in denying Mary Ann a new trial. Although Mary Ann was clearly the less culpable of the Ryders, the evidence does not so weigh against her conviction as to convince us that a miscarriage of justice may have occurred.

2.      Hearsay Testimony

Mary Ann claims that the district court committed reversible error by allowing her sister, Margaret McGlasson, to provide alleged hearsay testimony about the inheritance that Mary Ann and her siblings received from their grandfather. "We review the district court's evidentiary rulings for abuse of discretion." United States v. King, 351 F.3d 859, 864 (8th Cir. 2003), cert. denied, 124 S. Ct. 2852 ( 2004). We will reverse a conviction based on erroneous evidentiary rulings only if the error had a substantial impact on the jury's verdict. United States v. Lupino, 301 F.3d 642, 645 (8th Cir. 2002).

Mary Ann asserts that Ms. McGlasson's testimony was hearsay because the grandfather's will was never probated, and under Illinois law, an unprobated will is not valid evidence that title to property has passed hands, citing Krasauski v. Birbalas, 197 N.E.2d 140, 142-43 (Ill. App. Ct. 1964). Mary Ann's counsel objected to the government's attempt to introduce the will into evidence on the basis that it had not been probated, and the government withdrew its offer of the will. The government proceeded to question Ms. McGlasson about her knowledge about, and dealings with, the Illinois land. After Mary Ann's objection concerning the will, the government was careful not to ask Ms. McGlasson questions concerning information contained in the will. Rather, she testified that she and her sisters took control of the land immediately after their father's death, divided the profits among them, and that each sibling paid one-third of the property taxes. Regardless of the legal effect of the unprobated will, Ms. McGlasson had firsthand knowledge about how the property in

10

question had been treated since 1988 and her testimony about it was not hearsay. The district court did not err in admitting Ms. McGlasson's testimony.[2]

### 3. Reasonable Doubt Jury Instructions

Finally, Mary Ann takes issue with the reasonable doubt jury instruction given by the district court, arguing that the court failed to adequately instruct the jury that the government had to prove each element of the offense beyond a reasonable doubt, that the burden of proof remained with the government at all times and never shifts to the defendant, and that a conviction cannot be based on speculation, passion, prejudice, or sympathy. The district court rejected her proffered instruction, which she claims would have better explained these legal principles to the jury. We review the district court's refusal to give a specific instruction for an abuse of discretion. United States v. Whitehead, 176 F.3d 1030, 1037 (8th Cir. 1999). We review the instructions as given to ensure they properly conveyed the applicable law, and we will reverse a conviction based on erroneous instructions only when the instructions, as a whole, resulted in prejudice to the defendant. Id.

The instructions given by the district court meet all of Mary Ann's objections. Instruction number two told the jurors not to allow sympathy or prejudice to influence

---

[2]During the sidebar conference concerning the admissibility of the will, Mary Ann's counsel moved to strike Ms. McGlasson's prior testimony regarding distribution of the property under her grandfather's will. We question whether the objection preserved the issue, as Ms. McGlasson had already testified about the contents of the will without objection. Counsel initially objected only to admission of the will and did not object to Ms. McGlasson's testimony until well after it was given. Even if the issue was preserved, we cannot say that any error in not striking the prior testimony was prejudicial. Ms. McGlasson's nonhearsay testimony, coupled with Mr. Dahman's testimony that he rented the land from Mary Ann, provided more than sufficient evidence that Mary Ann had an interest in the Illinois farmland, regardless of Ms. McGlasson's testimony about the contents of the unprobated will.

11

them and that the verdicts were to be based on nothing other than the evidence, the jurors' common sense, and the law (R. at 42); instruction number four told the jurors that the burden of proof was on the government and there was no burden on either defendant to prove anything (R. at 44); and instruction number five informed the jurors that the defendants' presumption of innocence could be overcome only if the government proved beyond a reasonable doubt each essential element of the crimes charged (R. at 46). A defendant is not entitled to a particularly worded instruction as long as the instructions as a whole convey the law to be applied. Whitehead, 176 F.3d at 1037. Because the instructions as given properly informed the jury of the law to be applied to the case, the district court did not abuse its discretion in rejecting Mary Ann's proffered instruction.

## III. Sentencing Issues

After the district court sentenced Alfred and Mary Ann, the Supreme Court held unconstitutional a state sentencing scheme that allowed the sentencing court to sentence a defendant based on facts not admitted by the defendant or found beyond a reasonable doubt by a jury as a violation of the Sixth Amendment. Blakely, 124 S. Ct. at 2536. Shortly thereafter, the Supreme Court extended its Sixth Amendment Blakely holding to the United States Sentencing Guidelines. Booker, 125 S. Ct. at 756. All members of the Court agreed that but for the mandatory nature of the Guidelines, fact-findings by the district court would not offend the Sixth Amendment. Id. at 750 ("[E]veryone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the Guidelines binding on district judges."). To remedy the Sixth Amendment concern with the Guidelines, the Supreme Court excised the portions of the Sentencing Reform Act that made the Guidelines mandatory, leaving an advisory regime in its place. Id. at 764.

Following oral argument, Alfred and Mary Ann each filed supplemental papers seeking a remand for resentencing, arguing that the district court violated the Sixth Amendment by applying enhancements based on judge-found facts. Although neither defendant challenged his or her sentence below, the Federal Rules of Criminal Procedure allow us to review forfeited issues for plain error. See Fed. R. Crim. P. 52(b); United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc). To be entitled to plain error relief under United States v. Olano, 507 U.S. 725, 732-36 (1993), "there must be (1) error, (2) that is plain, and (3) that affects substantial rights." Pirani, 406 F.3d at 550 (internal marks omitted). Even if these conditions are satisfied, we may exercise our discretion to notice the error only "if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal marks omitted).

Mary Ann filed a supplemental brief shortly after the Supreme Court issued its Blakely ruling, arguing that the Guidelines were unconstitutional and that the district court's nine-level enhancement based on the $354,000 loss was not based on facts found by the jury. She argued that the Guidelines were severable and sought a remand for a sentence within the unenhanced sentencing range. Alternatively, Mary Ann argued that if the Guidelines were unconstitutional as a whole, then she should be resentenced within the statutory range of zero to five years. Alfred filed a pro se "Motion to Supplement Authorities" pursuant to Federal Rule of Appellate Procedure 28(j) after the Supreme Court issued Booker, arguing that his "Sixth Amendment right to a jury trial was violated because the judge–not a jury–determined the application of several enhancement[s] and/or aggravating factors under the U.S.S.G., including the loss amount and other specific characteristics." He also claimed that "the Supreme Court expressly stated [in Booker] that its conversion of the [G]uidelines into an advisory scheme was to be applied 'to all cases on direct review.'"

13

We construe each of the Ryders' supplemental filings to raise for the first time a Sixth Amendment challenge to the district court's use of the enhancements based on judge-found facts as well as a challenge to the mandatory application of the Guidelines, necessitating plain error review. As more fully explained below, we hold that Alfred and Mary Ann are each entitled to resentencing based on the district court's mandatory application of the Guidelines. We therefore do not tarry on the Sixth Amendment issues, other than to hold that the district court did not violate either defendant's Sixth Amendment rights in making the relevant enhancements. Each of the enhancements was based on facts that were either admitted by the defendants or subsumed within the jury's verdicts. On remand then, the district court should correctly apply the relevant Guidelines provisions in arriving at the proper advisory sentencing range,[3] and then should apply the other 18 U.S.C. § 3553(a) factors in arriving at a reasonable sentence for each defendant. See United States v. Mathijssen, 406 F.3d 496, 498 (8th Cir. 2005).

We grant Booker relief to the Ryders for the following reasons. The first two prongs of the plain error analysis are met by the district court's mandatory application of the Guidelines in sentencing the Ryders. See Pirani, 406 F.3d at 550 ("The district

[3]We note that the district court sustained Alfred's objection to use of the 2002 Guidelines as contemplated in his Presentence Report (PSR) and instead sentenced Alfred pursuant to the 2000 Guidelines. In so doing, it appears that the district court erroneously pulled the enhancement level from the 2000 Guidelines and plugged it into the calculation made in the PSR using the 2002 Guidelines. (Sent. Tr. at 84-85.) When the district court determined to use the 2000 Guidelines manual, it was required to use that version in its entirety. See USSG § 1B1.11(b) (Nov. 2000); United States v. O'Hagan, 139 F.3d 641, 654 n.8 (8th Cir. 1998). The relevant Guidelines provisions changed significantly between 2000 and 2002. Compare USSG § 2S1.1 (Nov. 2000) with USSG § 2S1.1 (Nov. 2002). Under our calculations using the 2000 Guidelines, Alfred's adjusted offense level would have been a level 21, the same adjusted offense level arrived at by the district court, though reached by way of an entirely different calculation. On remand, the district court should use the 2000 Guidelines manual in its entirety in determining Alfred's advisory Guidelines range.

court (understandably) committed <u>Booker</u> error by applying the Guidelines as mandatory, and the error is plain, that is, clear or obvious, at this time."). The third prong is met if there is "a reasonable probability that [the defendant] would have received a more favorable sentence with the <u>Booker</u> error eliminated by making the Guidelines advisory." <u>Id.</u> at 551. A sentence at the bottom of a sentencing range in itself is insufficient to establish a reasonable probability that a defendant would have received a lesser sentence had the district court treated the Guidelines as advisory. <u>Id.</u> at 553. Even a statement by the district court concerning its general dislike for the Guidelines fails to meet the defendant's high burden. <u>Id.</u> at 552 (noting that proving the third prong "should not be too easy" (internal marks omitted)), 553 n.6 (concluding that the district court's twice-expressed dislike for the Guidelines was insufficient to meet the defendant's burden). We review the record on appeal as a whole in making this determination. <u>Id.</u> at 552-53 (reviewing the whole record to determine whether the third prong was satisfied where the defendant did not argue the third prong in the terms ultimately required by the court).

The record on appeal in this case contains much more than a bottom-of-the-range sentence and a general dislike for the Guidelines. Indeed, the experienced district judge expressed no generalized dislike of them. Alfred and Mary Ann each sought a downward departure based on their ages and physical infirmities, relying on USSG §§ 5H1.1 and 5H1.4. At the time of sentencing, Alfred and Mary Ann were each over 70 years old and suffered from various medical conditions. With much trepidation, the district court denied their request based on its determination that neither of them met the Guideline definition of "seriously infirm," noting that it "struggled rather extensively with the question of whether the defendants, or either of them, are qualified for a downward departure." (Sent. Tr. at 83-84.) Before handing down Alfred's and Mary Ann's sentences, the district court stated, "This is a very sad case. . . . I wish that the sentencing laws of the United States, including the guidelines, were more flexible to allow me greater discretion than what I have. Within what limited discretion I have, it's my decision as follows[.]" (<u>Id.</u> at 93.) The

15

court proceeded to sentence Alfred to 41 months of imprisonment, noting that it was "the lowest sentence I can give you under the guidelines." (Id.) The court sentenced Mary Ann to twelve months and one day, noting that "[i]n effect, I have given you the shortest sentence I can." (Id. at 101.)

These statements by the district court convince us that it is reasonably probable that the district court would have given both Alfred and Mary Ann lesser sentences if it were able to sentence unencumbered by the mandatory nature of their respective Guidelines ranges. The district court clearly felt bound (as it legally was) by the Guidelines ranges, expressing that it would have liked to have had more discretion than it was allowed under the then-mandatory Guidelines. The district court's statements were based on its concern with the sentences resulting from the individual circumstances of the cases before him, not merely the inflexibility of the Guidelines in general. See United States v. Plumman, 409 F.3d 919, 931 (8th Cir. 2005) (finding the third prong met where the district court stated "I would not impose a life sentence but for the sentencing guidelines. . . . I think that the sentencing guideline as it's applied here is too harsh."); United States v. Rodriguez-Ceballos, 407 F.3d 937, 941 (8th Cir. 2005) (finding the third prong met where "the district court consistently expressed its belief that the Guidelines range resulted in a disproportionate sentence" for the defendant). Though the burden on the third prong should be and is high, we believe it is met in this case.

Having found the first three prongs of the plain error test satisfied, we must now determine whether to exercise our discretion, which we can do only if the Booker error in this case "would 'seriously affect[] the fairness, integrity, or public reputation of judicial proceedings.'" Rodriguez-Ceballos, 407 F.3d at 942 (quoting Johnson v. United States, 520 U.S. 461, 467 (1997)). Discretionary relief on the fourth prong does not follow automatically from a finding of substantial prejudice under the third prong. As we noted in Pirani, the actual sentence resulting from a mandatory application of the Guidelines pre-Booker is not illegal, just the mandatory

16

process by which the district court derived the sentence. The en banc court in Pirani suggested that the fourth-factor inquiry in this type of Booker error case is more akin to the analysis in "United States v. Cotton, where the Supreme Court refused to exercise its discretion to review a plain Apprendi error . . . because '[t]he real threat to the 'fairness, integrity, and public reputation of judicial proceedings' would be if respondents, despite the overwhelming evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial.'" Pirani, 406 F.3d at 554 (quoting United States v. Cotton, 535 U.S. 625, 634 (2002)) (second alteration in original).

The district court expressed its frustration with the Guideline-imposed limitations on its sentencing discretion related to Alfred's and Mary Ann's health and ages. Following Booker, district courts must now consider various factors listed in 18 U.S.C. § 3553(a) in addition to the still applicable but now advisory Guidelines range. In addition to the advisory Guidelines range, the district court can consider such things as "the history and characteristics of the defendant," § 3553(a)(1), and "the need for the sentence imposed to provide the defendant with needed . . . medical care . . . in the most effective manner," § 3553(a)(2)(D). Although age and physical condition are still discouraged Guidelines departure factors, neither is prohibited for purposes of granting a downward departure (as that term is used in the Guidelines), and both, if present to the extent required, may properly support a departure in reaching an advisory Guidelines sentence. See USSG §§ 5H1.1, 5H1.4. The prior mandatory nature of the Guidelines deprived the district court of the opportunity to consider age and physical condition in any manner other than as a basis for a Guidelines departure. Now coupled with the requirements in § 3553(a) that a district court consider a defendant's characteristics and the need to provide medical care in the most effective manner when sentencing a defendant, the district court would be well within its discretion to at least consider Alfred's and Mary Ann's ages and medical conditions as non-Guideline factors on remand. We believe it "would

'seriously affect[] the fairness, integrity, or public reputation of judicial proceedings'" to not allow the district court to consider these factors now. See Rodriguez-Ceballos, 407 F.3d at 941-42 ("Given the state of this record, affirming [the defendant's] sentence despite the district court's erroneous belief it was required to impose a sentence which the district court clearly thought had a disproportionate impact on [the defendant] would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'"); cf. United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005) (remanding for resentencing where the district court felt bound by the Guidelines to deny a motion for a downward departure based on the defendant's advanced age and physical condition). Having found the fourth factor met, we exercise our discretion and notice the district court's Booker error.

## IV. Conclusion

We affirm Alfred Ryder's and Mary Ann Ryder's convictions, but we vacate each of their sentences and remand to the district court for resentencing pursuant to United States v. Booker.[4] We express no opinion as to what a reasonable sentence would be for either defendant, and nothing in this opinion should be construed as an indication that we think a more lenient sentence is warranted.

-----

[4]Given Mary Ann's twelve-month-and-one-day sentence and her surrender date of December 29, 2003, we understand that Mary Ann should have been released from prison by now. The district court may still consider a new sentence for her, however, as it may affect the timing of her present two-year term of supervised release.

18